McKinney, J.,
delivered the opinion of the Court.
The complainants brought this bill to regain the possession of a lot in the city of Memphis, alleged to be the property of Mrs. Graugh, and to have the title of the defendants declared void for fraud. The Chancellor decreed for the complainants, and the defendants appealed.
The material facts of the case are as follows: On *630 the 18th of December, 1840, the lot in question, which was then wholly unimproved, was conveyed by W. L. Vance to the complainant, Alicia, then Alicia Ann Ker-nahan, an infant about six years of age, and daughter of one Andrew Kernahan. The consideration of the conveyance is stated to be $350, paid by said Alicia. This deed was duly proved and registered on the 6th of February, 1841.
. Shortly after the date of this conveyance, Andrew Kernahan, complainant’s father, proceeded to erect a frame dwelling house on said lot; and in April, 1842, five several judgments were rendered against him before a justice of the peace of Memphis, in all amounting to some $900, for the carpenters’ and brick-masons’ work done on said house. Executions on these judgments issued, and were returned levied upon said lot, being lot, No. 358, in the city of Memphis, on the 18 th of April, 1842, as the property of Andrew Kernahan; and at the June Term of the Circuit Court of Shelby county, the papers being returned into Court by the justice, judgments of condemnation were rendered, and said lot ordered to be sold.
The lot was sold by the sheriff, on the 2d of October, 1842, and was bid off by William Henderson, at the price of $950 ; and on the 12th day of December, 1842, the sheriff executed a deed to said Henderson for said lot. On the day after the sheriff’s sale, to-wit, on the- 3d of October, 1842, William Henderson, the purchaser, sold and conveyed said lot to said Andrew Kernahan, at the price of $2000, for which Kernahan executed four notes, each for $500, payable at one, two, three and four years, and to secure said purchase money, *631 Kernahan, at the same time, by deed of trust of even date with the conveyance to him, conveyed said lot to Seth Wheatly and Jas. R. Williams, as trustees, vesting the legal title in them, with power' to sell, if said notes were not paid at maturity, (which deed of trust seems still to remain in force.)
Afterwards, on the 23d day of June, 1848, Kerna-han, for the consideration of $750, sold and conveyed all his interest in said lot — being his equity of redemption under the trust deed — to the defendant, Andrew Henderson; and afterwards, on the 28th day of February, 1844, William Henderson assigned and transferred all his interest under said deed of trust, and the debt of $2000, thereby secured, to-defendant, Andrew Henderson. Shortly after this, to-wit, on the 4th of March, 1844, Andrew Henderson, (who was a resident of New Orleans,) by his agent, said William Henderson, filed a bill in the Chancery Court, at Somerville, against the infant, Alicia Ann Kernahan, to have the foregoing deed made to her by Yance, for said lot, declared void, and the title divested out of her and vested in said Henderson.
The ground of the relief, assumed in the bill, is that the consideration money of $350, paid to Yance for the lot, was paid by said Andrew Kernahan, out of his own money, and that he caused said conveyance to be made by Yance to his infant daughter, to protect the property from his creditors — he being then insolvent, and indebted to a large amount — therefore, said conveyance was “voluntary as against his creditors, and void.”
On the 23d day of May, 1845, a decree was made in said cause for the complainant, declaring the convey- *632 anee to Alicia to have been made to defraud the creditors of A. Kernahan, and divesting the title out of the said Alicia Ann, and vesting the same in complainant, Henderson.
Soon after the filing of said bill, name-ly, on the 16th day of June, 1844, the complainant, Andrew Henderson, by his attorney in fact, William Henderson, sold and conveyed said lot to one John Delafield, of whom notice will be taken presently; and after various intermediate sales and conveyances, said lot was purchased by the defendants, the Messrs. Greenlaw.
The said Alicia intermarried with the otter complainant, and on the 8th day of May, 1858, and within less than three years after complainant, Alicia, attained her full age, this bill was filed, to have said sheriff’s sale, the decree before mentioned, and the various conveyances, including that to defendants, Greenlaw, declared illegal, fraudulent, and void.
Several important and vexatious questions' of law and fact have been discussed in the argument.
For the complainants it is insisted, that the execution sale was void, and communicated no title to the purchaser for various reasons:
1. It is insisted, that if it were admitted to be true, that the lot was purchased and paid for by Andrew Kernahan, with his own money, and the title made by his procurement to his infant daughter, for the avowed purpose of protecting the property against his own creditors, that still the lot could not be seized and sold by execution at law by his creditors; but only by decree of a Court of Equity. See 10 Hum., 13; 7 Yer., *633 155, 159; 1 Iredell’s L. Rep., 553; contra 1 Hum., 491; 6 Hum., 93; 19 Wend., 414.
There' is a serious conflict of judicial opinion upon; this point, and as its determination is not necessary t<y the present decision, in the view we have taken of the' Case upon the facts, we pass it by.
2. It is further urged, that taking it as established, that the consideration money was paid by the father, still, as it is not proved that there were any judgment creditors of his existing at the time of the conveyance, the investment must be regarded as an advancement by the father for the benefit of his child; or a voluntary settlement upon her, which subsequent creditors cannot challenge or impeach, merely on the ground of its being voluntary. With reference to the facts of this case, this proposition is by no means free from difficulty. But we lay it aside, and proceed to consider the case upon the facts.
3. It is insisted- that the sale was void, because there is nothing in the record to show that writs of ven-ditioni exponas ever issued to authorize said sale. The proof shows that no such writs can now be found by the present clerk — not that such writs were not in fact issued; but the clerk states, that in the column of the execution docket, set apart to note the date of the issuance of writs of fi. fa. and venditioni exponas, he finds this memorandum, “ July Tth, ’42;” which, from his knowledge of the manner of' keeping the docket, he understands to represent the date of the issuance of the writs of venditioni exponas in said cases. This date would suit, as the writs must have been tested of the Juno Term, 1842, the date of condemnation of the lot, and *634 were executed on the return day of the following October Term. The sheriff’s deed, made soon after the sale, recites the writs in his hands; but this recital is not evidence of the fact. Without more, however, we think this objection must fail.
4. But the fact that Andrew Kernahan paid any part of the consideration money of said lot is utterly denied by the complainants. And this is the turning point of the case. If the truth be not so, then it follows, of course,. that the sheriff’s sale, and the proceeding in equity, are alike inoperative and void to affect the title of' the complainant, Alicia. •
And upon this point, it must be borne in mind, that the burden of proof is upon the defendants, to disprove, by clear and satisfactory evidence, the truth of the fact recited in the deed. And it must likewise be remembered, that lapse of time, under the circumstances, furnishes no presumptions in favor of the defendants, or prejudicial to the complainant, who all the while, from the time of the sale, has been within the saving of the .statute - of, limitations.
The proof mainly relied on to establish the fact of the payment of the purchase money of the lot by A Kernahan, is his deposition taken in the Chancery suit of Andrew Henderson, against complainant, Alicia, before mentioned.
If exception had been taken to this deposition on the hearing, we incline to the opinion that it ought to have been rejected; and, on the objection made here, we are by no means satisfied that it ought not to be regarded as inadmissible evidence. The objections to it are numerous, and some of them of a very grave character.
*635 It was taken on tke 19th of March, 1844, just fifteen days after the filing of the bill, which was an appearance to the May Term, following, and three months before the cause was put at issue, by filing a replication; and was not, so far as can be seen from this record, taken de bene esse. For this reason it was liable to have been suppressed, and would have been, doubtless, but for the culpable neglect of the next friend of the infant to take exception to it. But another objection, of a more serious nature, arises out of the conduct of the next friend of* the infant in taking said deposition.' And here it is proper to exonerate from all censure, the highly respectable gentleman who appeared as counsel for the plaintiff, in taking said deposition. He did nothing more than his professional duty seemed to demand of him, and was doubtless wholly ignorant of the fact, too apparent from all the circumstances of this case to be denied, that a combination existed between the agent of complainant and the next friend of the infant, to obtain a decree divesting the infant of her title by artifice and fraud. The next friend of the infant was a lawyer, and was appointed next friend on the application of the agent of complainant; and from all the circumstances of the case, the conclusion. cannot be resisted, that he was so appointed to aid in the accomplishment of the object sought by the bill. The law partner of the next friend was counsel for the complainant; and the next friend could not, perhaps, have better subserved the purposes of the complainant, if he himself had stood in the same relation. And in less than three months after taking said deposition, and pending the suit, the next friend became himself the absolute purchaser of said lot; thus putting *636 •himself in an attitude of open hostility to the interests of the minor, which he had undertaken to protect. This act of the next friend furnishes almost conclusive evidence of 'the charge in the bill, that he was procured to accept that office by collusion with the agent of the complainant, not to protect, but the more effectually to aid in destroying her rights, under color of the decree of a Court of Equity. And it may be here remarked, that the very fact of resorting to a Court of Equity to divest the title of the infant, is persuasive evidence of the belief, on the part of the complainant and his confederates, that the execution sale was ineffectual for that purpose, and cannot but tend to discredit the truth of the hypothesis upon which it is now attempted to sustain the validity of that sale. It furnishes a clue likewise to the hasty, extraordinary, and irregular proceedings which characterize the management of the suit in Chancery.
But, to return to the deposition of Andrew Kerna-han, and the circumstances under which it was taken. It seems that the next friend was intrusted to write both the questions and answers. And what is most worthy of notice is, that after writing down the answers to all the questions put by the complainant, and finding a strong prima facie case made out against the infant,, the next friend seemed satisfied to dismiss the witness without even attempting to break the force of his statement by a single question, by way of cross-examination. If this be explicable, or excusable, it cannot be on the score of ignorance of duty on the part of the next friend, for he is shown to have been a lawyer of some experience. Nor does it appear that a single deposi *637 tion was taken in the cause, or a question asked of any witness, on behalf of the infant.
But waiving the foregoing objections to the deposition of the witness, the objection that he was an incompetent witness by reason of interest in the result of the suit, is at least very plausible. His notes for $2000 remained. unsatisfied to Henderson, the complainant, in the event of the determination of the suit in favor of the title of the infant. If this be not sufficient to render him incompetent, it certainly tends to impair his credit. His claims to credit must also he somewhat impaired by the fací, that the deposition was taken at a time when he was just recovering from a state of mental and physical derangement, the result of excessive intoxication, to which he was • subject. This fact is established not only by the proof of Mrs. Burns, hut also by the deposition of Mrs. Logan.
If, however, we overlook all exceptions to the testimony of A. Kernahan, does it sustain the assumption that the lot was paid for by him with his own money ?
The witness states the fact to be, that he paid for it, except the sum of twenty-five dollars, paid by Thos. Patterson, and that he obtained the money from the Farmers’ and Merchants’ Bank.
This is the only proof in support of the allegation that the lot was paid for by Kernahan. It is true, Titus proves that he indorsed a note for Kernahan, about the year 1840, for about the sum of $350, to be used, as he understood, in building a house, or in purchasing a lot for his family. But whether or not the money was actually received on the note thus indorsed, is not proved; or if received, there is no proof that it was *638 applied to the payment of • the price of the lot, except the uncorroborated statement of Kernahan; in opposition .to which there is an overwhelming weight of evidence, direct and circumstantial. The whole testimony in the case, however, is perfectly reconcilable. The fact that Kernahan received $350 from the bank, may be admitted as proved; but how was it applied ? Titus says, it was to be used in building a house, or in the purchase of a lot — he does not know which. Now the fact is shown, that immediately after the sale of the lot by Vance, Kernahan commenced the erection of a house on said lot; and it is not questioned but that all that ever was paid towards the expenses of building the house, was paid by Kernahan.
And from the whole record, the conclusion is forced upon the mind, that the $350 procured from the bank must have been expended in paying for the materials and the building of the house. This view reconciles the testimony of the witnesses with each other, and with what appears to be the truth of the case. And, at most, it merely involves Kernahan in a mistake as to the fact of the appropriation of the money; or rather, perhaps, that in taking his deposition, he was, by misapprehension or otherwise, made to say' that the money was applied to the payment of the price of the lot, instead of to the purchase of lumber and the expenses of the building, which, it is admitted, he put upon the lot.
In any other view of the case, it is impossible to give credit to Kernahan’s statement. ■
The proof establishes positively that the purchase of the lot was negotiated by Joseph Henderson, on behalf *639 of the "wife and infant daughter of .Kernahan, who were reduced to the necessity of going into a shanty, by the intemperance and improvidence of the husband and father.
Top proves that Henderson paid the money for the lot; that it was made up, as he understood, by the friends of Mrs. Kernahan, who had high esteem and affection .for her, and deeply 'sympathized with her and her infant in their abject poverty. He further proves, that he and Yance (who owned the lot) estimated its value at five to six hundred dollars; but at the importunity of Henderson, Charles Lolland, and other friends of Mrs. K., agreed to take ¡$350, intending the difference between that sum and the • value of the lot, as a contribution on their part to Mrs. K. and her infant. And Top likewise proves that the title was made to the infant daughter by the direction of the persons who made up the money to pay for the lot.
The witness, C. D. McLean, proves that he was called on by Joseph Henderson, as a friend of the family of Kernahan, to assist in making up the money to purchase a home for them; and that an appeal was made to him, as a brother mason, to assist, in the ante room of the lodge, in the presence of Eraser Titus, E. Titus, Charles Lofland, and others? whose names he had forgotten — all of whom contributed, and handed the money over to Joseph Henderson, the witness himself paying ten dollars; and said money, as he understood, was apr propriated to pay for the lot for Kernahan’s infant daughter.
Other testimony, of a circumstantial character, goes to place the truth of this fact beyond all reasonable doubt; and the allegation of the bill that the lot was *640 thus purchased and paid for, we regard as sufficiently proved.
This single matter of fact 'is decisive of the case. The consequence is, that the sale of the lot, upon an execution against Andrew Kernahan, was simply a nullity, and in no way affected the title of the infant daughter. And for this the auxiliary proceeding in •Chancery was alike inoperative and void; and if necessary to the decision of this case, we should likewise declare it void on the ground that it was, in its inception, as well as in its progress and final consummation, a meditated scheme of fraud between the next friend of the infant and the agent of Andrew Henderson, to take from her the bounty intended to be secured to her by the friends of herself and mother.
The decree of the Chancellor will therefore be affirmed, so far as it goes. But the complainants are seeking equity, and must do equity, by accounting for the enhanced value of the lot, by reason of the permanent improvements erected thereon, exclusive of the improvements made by Andrew Kernahan. But the extent of this liability will be left open. until the final hearing. •
Decree for complainant.